**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


JACK JUDGE, JR.                          :
                                         :     CIVIL ACTION
                Plaintiff,               :
        v.                               :
                                         :
PHILADELPHIA PREMIUM OUTLETS,   :     NO. 10-1553
et al.                                   :
                                         :
                Defendants.              :


**MEMORANDUM**

BUCKWALTER, S.J.                                        March 15, 2012


        Currently pending before the Court is the Motion of Defendant ABM Mid-Atlantic, Inc.

("ABM") for Summary Judgment.  For the following reasons, the Motion is denied.

**I.      PROCEDURAL BACKGROUND**

        Plaintiff Jack Judge, Jr. commenced this lawsuit against Defendants Philadelphia

Premium Outlets, Chelsea Limerick Holdings, LLC, Chelsea Property Group, Inc., Simon

Property Group, Inc. a/ka and/or d/b/a and/or t/a Simon Property Group, LP and/or Simon

Property Group Delaware, Inc., Ann Taylor Stores Corp. a/k/a and/or d/b/a and/or t/a Ann Taylor

Retail Inc. and/or Ann Taylor, Inc. and/or Ann Taylor, Ann Taylor Loft Outlet Store 2909

Philadelphia Premium Outlet, ABM Inc. Building Maintenance a/k/a and/or d/b/a/ and/or t/a

ABM Engineering Service Company and/or ABM Industries Inc. and/or ABM, and HGO Inc.

Building Maintenance Services a/k/a and/or d/b/a and/or t/a HGO Services, Inc. and/or HGO

Corporation and/or HGO Incorporated Building Services.  According to the Complaint, on

December 7, 2007, Plaintiff was on a walkway adjacent to an Ann Taylor Loft Outlet Store at the

Philadelphia Premium Outlets in Limerick, Pennsylvania.  (Compl. ¶ 18.)  While walking, he tripped over an unsecured and unfastened electrical extension cord located on the walkway of the Outlets' property and connected to an illuminated holiday decoration.  (Id.)  He stumbled and fell to the ground, resulting in injury.  (Id.)

On December 3, 2009, Plaintiff initiated litigation in Philadelphia County Court of Common Pleas on grounds of negligence.  (Id. ¶¶ 28–67.)  In turn, the owners of the Property, Defendants Philadelphia Premium Outlets, Chelsea Limerick Holdings, LLC, Chelsea Property Group, Inc., and Simon Property Group, Inc. (collectively, the "Chelsea Defendants"), filed a Cross-claim against co-Defendant ABM based on the facts that (a) ABM had entered into a contract, wherein it agreed to provide janitorial and maintenance services for the Philadelphia Premium Outlets ("Philadelphia Premium Outlets," "Outlets," or "Property") from October 15, 2007 to October 31, 2010, and (b) had assisted in placing the electrical extension cords in question.  (Chelsea Defs.' Answer & Cross-cl. ¶¶ 82, 84–85.)  The Cross-claim asserted a cause of action against ABM pursuant to Pennsylvania Rule of Civil Procedure 1031.1,[1] (id. ¶¶ 77–80),

---

[1] This Rule states:

Any party may set forth in the answer or reply under the heading "Cross-claim" a cause of action against any other party to the action that the other party may be

   (1) solely liable on the underlying cause of action or

   *Note:* The term "underlying cause of action" refers to the cause of action set forth in the plaintiff's complaint or the defendant's counterclaim.

   (2) liable to or with the cross-claimant on any cause of action arising out of the transaction or occurrence or series of transactions or occurrences upon which the underlying cause of action is based.

as well as four additional causes of action for: (1) breach of contract (id. ¶¶ 81–103); (2) indemnification (id. ¶¶ 104–07); (3) negligence (id. ¶¶ 108–15); and (4) breach of promise to obtain insurance.  (Id. ¶¶ 116–24.)  Defendant ABM filed a motion to dismiss Count IV of the Cross-claim, which the Court denied on June 14, 2010.

On January 25, 2012, Defendant ABM moved for a general grant of summary judgment in its favor.  Via this Motion, ABM now claims that it cannot be held vicariously liable for the alleged negligence of its employees that acted under the direction and control of others, and outside their scope of employment.  The Chelsea Defendants responded on February 15, 2012, and ABM filed a Reply Brief on February 17, 2012.  Plaintiff filed no response in opposition.

## II.   FACTS PERTAINING TO THE PRESENT MOTION

On September 27, 2007, the Chelsea Defendants and ABM entered into a Service Agreement for ABM to provide janitorial services at the Philadelphia Premium Outlets.  (ABM Mot. Summ. J., Ex. B ("Service Agreement").)  The scope of the work encompassed by this document included the following:

> (1) The center space shall be free of obvious dirt, debris, and dust (including solid waste rooms & vending areas).  Glass surfaces shall be clean and free of smudges.  Furniture shall be free of obvious dust, dirt, spots, and debris.  Carpets will be free of obvious spots and stains, and shall be clean and free of dirt and debris.  Empty and damp wipe ashtrays.  Washbasins, sinks and mirrors shall be clean and free of dust, dirt and encrustation.  Contractor is responsible for any interior door, corridor, security divider, reception and room divider glass.  Spot clean walls, doors and floors to remove all stains.  All floors will be maintained according to best trade practices.  Floors requiring a finish shall be maintained at a high luster and free of all marks, dirt and debris.  Venetian blinds, if any shall be free of dust.
>
> (2) Drinking fountains will be cleaned to be free of water marks, and any other debris of encrustation.  Drinking fountains shall be maintained at a high level of sanitation.

Pa. R. Civ. P. 1031.1.

(3) All trash will be collected and removed to a location designated by Philadelphia Premium Outlet.  Trash cans shall be emptied as needed and kept clean and free of dirt, stains, and debris.  Plastic liners for all trash, debris and recycling containers shall not be torn, worn, or contain residue.  Philadelphia Premium Outlets is responsible for any and all cost for trash and recycling removal.

(4) Restroom will be cleaned and sanitized with a disinfectant cleaner.  Fixtures will be free of dust, streaks and encrustation.  Fixtures will be free of dust, streaks and encrustation.  Clean, sanitize and polish all surfaces of fixtures, including toilets, urinals, wash basins, and shower stalls.  Clean, sanitize and polish all surfaces of fixtures, including toilets, urinals and wash basins.  All plumbing on fixtures shall be free of dust, streaks and encrustation.  Mirrors and glass shall be clean and free of spots and streaks.  Floor will be clean and sanitized with a disinfectant cleaner and free of dust, dirt debris, or bacteria.  Partitions and walls will be free of obvious dirt, graffiti, and dust.  Toilet supplies shall be replenished as needed to maintain an adequate supply at all times.  Contractor, when necessary is responsible for installing paper towel, toilet paper, toilet seat cover dispensers, tampax and sanitary napkin dispensers.  The contractor is responsible for the filling of soap dispensers.  The placement of the dispensers shall be at the discretion of the Philadelphia Premium Outlets General Manager.  All sanitary napkin disposal containers shall be provided with a wax liner.  The Contractor will be responsible for, maintaining and servicing wall-type mounted deodorizers, aerosol type, for each restroom, in a sufficient quantity to rid each restroom of any odor and will ensure that all restrooms are supplied with an approved deodorizer at all times.  Trash pulled during day as needed.  **At a minimum restrooms will be policed every 30 minutes.**

(5) All stairways, including landings, steps, railings, ledges, grilles, fire apparatuses, shall be free of dirt, dust, and debris.  Spot clean walls, doors, radiators, and stairs/landings to remove any spillages.

(6) All entranceways, sidewalks, driveways, loading docks, and platforms shall be free of obvious dirt, debris, cigarettes, and weeds.  The Contractor shall use the best efforts to remove gum, candy and oil stains.  All entrance ways will be scrubbed daily.

(7) Walk off mats provided by Philadelphia Premium Outlets shall be clean, free of dirt, debris and spots.

(8) Contractor will participate in performing snow removal.  Employee's schedules maybe altered to properly conduct the snow removal process, enabling Philadelphia Premium Outlets to open as typically scheduled.

(Service Agreement, Ex. A at 9–10 (emphasis in original).)

4

The parties each presented several witnesses who, at deposition, offered their perspectives on the scope of this Agreement and ABM's resulting contractual responsibilities.  First, Brent Saville testified that he was hired by the Chelsea Defendants, the owners of the Philadelphia Premium Outlets, in October 2007.  (ABM's Mot. Summ. J., Ex. C, Dep. of Brent Saville, 16:7–10, 17:3–14, Oct. 5, 2011 ("Saville Dep.").)  At that time and during the time of the relevant events, he was employed as a maintenance tech.  He remained in that position until 2008, when he became a custodial supervisor, replacing the former custodial supervisor Victor Buono.  (Id. at 18:20–19:5, 23:18–22, 31:5–32:11.)  As a custodial supervisor, his job was, in part, to oversee the janitorial services provided by employees of ABM.  (Id. at 19:14–18.)  In addition, he would schedule ABM employees, call the ABM account manager if additional janitors were needed, and would oversee the work of the ABM janitors to make sure that everything was getting done properly.  (Id. at 21:13–22:6.)

During the holiday season of 2007, Mr. Saville indicated that he placed some holiday decorations outside at the Philadelphia Premium Outlets.  (Id. at 34:10–15.)  He explained that he drove the scissor lift, placed the decorations on the top part of the lampposts, strung bows, and ran lighted garland halfway down the lampposts.  (Id. at 37:19–22.)  At that point, he had two ABM employees standing below the scissor lift, who continued to wrap the garland, plug the lights into the lamp pole, and then zip tie the end of the garland strand to the pole itself.  (Id. at 37:22–38:22.)  The Chelsea Defendants provided all necessary materials and equipment, including the zip ties, the garland, and the scissor lift.  (Id. at 38:23–39:14.)  An electrical cord—the one over which Plaintiff in this case tripped—was then run over a sidewalk.  (Id. at 57:13–58:7.)  At no point did Mr. Saville ever tell ABM that they had a responsibility to tape that

electrical cord down or to put an electrical cord covering on it because it looked "pretty obvious" to him that the cord was there.  (Id. at 60:14–24.)  Although Mr. Saville did not believe it was his "call" as to whether the electrical cord should be covered, he effectively conceded that the ABM employees had no say in directing how and where the holiday decorations were installed.  (Id. at 61:18–63:21.)  To the extent any instructions were given on how to install the garland on the lamppost, those instructions came from Ron Scott, the Chelsea Defendants' Operations Manager and Mr. Saville's immediate supervisor.  (Id. at 31:5–32:11, 68:20–69:18.)  Mr. Saville did not recall if he was given instructions regarding the use of tape or cord covers.  (Id. at 70:10–71:2.)  Moreover, he could not identify—either by name or description—the ABM employees that helped him.  (Id. at 40:6–20, 67:14–68:1.)

Aside from Mr. Saville, Defendant ABM also presented the deposition testimony of Dennis Dotterer, who, during the November-December 2007 timeframe, was employed by ABM as an area manager to help operate janitorial accounts from King of Prussia to Harrisburg.  (Def. ABM's Mot. Summ. J., Ex. D, Dep. of Dennis Dotterer, 14:1–24, Oct. 5, 2011 ("Dotterer Dep.").)  One of the accounts he managed was the Philadelphia Premium Outlets.  (Id. at 15:15–18.)  He explained that ABM had no supervisors on site during the day at the Philadelphia Premium Outlets, but rather were supervised by the Chelsea Defendants' employees.  In late 2007, custodial supervisor Victor Buono was the person controlling day-to-day activities of the day staff employed by ABM.  (Id. at 40:20–23.)  From 5:00 p.m. on, however, ABM had their own supervisor or "lead person" on site.  (Id. at 18:19–22:23.)  As a general rule, the owners and managers of Philadelphia Premium Outlets dictated the work being performed by ABM.  (Id. at 39:21–40:22.)

Mr. Dotterer further indicated that, as a general practice, ABM would pick up litter, sweep various areas, operate equipment on the property, perform snow removal, repair janitorial equipment, and assist with various maintenance tasks. (Id. at 27:1–28:2.) During the holiday season 2007, ABM employees helped put up holiday decorations under the direction of Victor Buono and another individual named Chris Speca, who was the General Manager of Philadelphia Premium Outlets. (Id. at 16:15–20, 46:4–19, 53:4–13.) Mr. Dotterer, however, had no knowledge of who made the decisions as to the placement of the decorations, the decisions on how to secure electrical cords, or the individuals involved in installing the decorations. (Id. at 28:8–49:23.) He stated that he did not believe that the decision on how to secure an electrical cord across a sidewalk would have been made by the janitors, but rather by the maintenance men. (Id. at 49:1–11.)

Finally, Christopher Speca—the General Manager of the Philadelphia Premium Outlets in December 2007—provided some further insight into both management structure at the Outlets and the installation of the holiday decor. (Chelsea Defs.' Resp. Opp'n Mot. Summ. J., Ex. D, Dep. of Christopher Speca, 11:11–13:11, Sept. 7, 2011 ("Speca Dep.").) He remarked that his assistant general manager at the time, Mary Rose Drucas, was typically at the Property Monday through Friday during normal business hours. (Id. at 22:13–24:13.) In addition, Operations Manager Ronald Scott worked normal office hours Monday through Friday, as well as weekends, and was in charge of overseeing custodial services, maintenance, and security. (Id. at 24:13–24.) Victor Buono typically worked Tuesday through Saturday during the day. (Id. at 25:19–26:7.) Finally, Brent Saville, as the sole handyman or maintenance tech in late 2007, worked primarily during the day doing general handyman work. (Id. at 27:2–1, 33:15–19.) Under the hierarchy at

the Philadelphia Premium Outlets, Mr. Saville reported to Mr. Buono, Mr. Buono answered to

Mr. Scott, and both Mr. Scott and Ms. Drucas would report directly to Mr. Speca.  (Id. at

26:8–15.)

Turning to the installation of the subject holiday decor, Mr. Speca testified that although

the ABM Service Agreement did not specify that ABM employees were to put up holiday

displays, ABM employees had assisted in the placement or installation of such displays since the

opening of the Philadelphia Premium Outlets.  (Id. at 38:17–39:13.)  Indeed, he indicated that

ABM generally participated in the overall maintenance of the Outlets and got involved in

projects other than cleaning tasks, including snow removal, repairing and maintaining janitorial

equipment, hanging lighting and Christmas decor, and unloading supplies such as calcium bags.

(Id. at 41:7–42:21.)  Mr. Speca believed that ABM never billed separately for their annual

participation in the holiday decorating, which was done alongside of the maintenance men

employed by the Chelsea Defendants.  (Id. at 43:22–44:21.)  Mr. Speca had no specific

knowledge as to who exactly installed the holiday lights in November and December 2007,

including the electrical cord over which Plaintiff tripped.  (Id. at 64:19–65:22.)  In addition,

while he was responsible for the decision to have lights placed on the evergreen trees for the

holiday season, he explained that the manner in which those lights were placed was left to

Operations Manager Ronald Scott.  (Id. at 69:23–70:10, 72:11–75:1.)

Via a subsequently-prepared affidavit, dated February 15, 2012, Mr. Speca clarified some

of his testimony and averred that under the Service Agreement, ABM was responsible for

performing tasks at the Philadelphia Premium Outlets related to the general upkeep of the

Property. (Chelsea Defs.' Resp. Opp'n Mot. Summ. J., Ex. E, Aff. of Christopher Speca, ¶¶ 7–8,

Feb. 15, 2012 ("Speca Aff.").)  He stated that during course of multiple holiday seasons, ABM personnel was contractually obligated to put up holiday lights at the Outlets, and would work alongside maintenance personnel employed directly by the Outlets.  (Id. ¶¶ 9–11.)  Notably, the Chelsea Defendants did not hire, fire, or train ABM employees, as these responsibilities fell on ABM itself.  (Id. ¶¶ 12–14.)  Mr. Speca also remarked that, while at the Philadelphia Premium Outlets, ABM was responsible for having a "lead person" to supervise and direct ABM in their responsibilities.  (Id. ¶ 15.)  No Chelsea Defendants' personnel were assigned to direct or control specific tasks of ABM personnel; rather the Outlets' management staff dealt with ABM's management staff.  (Id. ¶¶ 16–17.) [2]

## III.    STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

---

[2]  The Chelsea Defendants also include the deposition of Darren Korz.  (Chelsea Defs.' Resp. Opp'n Mot. Summ. J., Ex. G, Dep. of Darren Korz, Oct. 5, 2011 ("Korz Dep.").)  The Court, however, does not find this deposition to be probative of any facts relevant to the present dispute since Mr. Korz was not involved as a site manager for the Philadelphia Premium Outlets until July 2008, well after the events in question.  (Id. at 12:8–16.)  Although Mr. Korz was able to testify regarding ABM's practices at the Philadelphia Premium Outlets from July 2008 on, that testimony does not shed any light on what occurred during the holiday season of 2007.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant

will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## IV.    DISCUSSION

Defendant ABM presently seeks summary judgment in its favor on the grounds that it did not direct or control the work of the alleged unidentified employee(s) that purportedly participated in the installation and placement of the holiday decorations and subject electrical cord at issue.  The Chelsea Defendants, however, respond that the Motion should be denied because (1) the record establishes that ABM's personnel were contractually responsible for putting up holiday lights at the Philadelphia Premium Outlets, and (2) ABM personnel were not "borrowed servants" or subject to control by the Chelsea Defendants.[3]  The Court considers each argument individually.[4]

──────────────────────

[3]  Plaintiff has filed no response in opposition to this Motion.  In cases of no response, the Court is guided by Federal Rule of Civil Procedure 56(e), which states:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting—including the facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  Because the Chelsea Defendants have filed an opposition, however, the Court considers their arguments in deciding whether summary judgment is appropriate.

[4]  Notably, in its briefing, ABM simply moves for summary judgment without specifying whether it seeks such judgment on Plaintiff's Complaint, the Chelsea Defendants' Cross-claim, or both.  Nor are ABM's arguments focused on the separate contractual and tort causes of action asserted against it; rather it argues only that it is entitled to summary judgment on its borrowed

A.      **Whether the Service Agreement Provided that ABM Employees Would Assist in the Installation of Holiday Lighting at the Philadelphia Premium Outlets**

The Chelsea Defendants first assert that ABM employees' participation in the overall maintenance of the Property was specifically contemplated under the terms of the Service Agreement and ABM agreed that it would provide capable employees and competent work. (Chelsea Defs.' Answer & Countercl. ¶¶ 81–103.)  Further they argue that ABM's personnel were contractually responsible for putting up holiday lights at the Philadelphia Premium Outlets. Because ABM failed to fully perform its contractual duties in a competent manner, the Chelsea Defendants claim that summary judgment on the breach of contract causes of action is improper.

Under Pennsylvania law, a breach of contract is established by showing (1) the existence of a contract; (2) a breach of a duty imposed by that contract; and (3) resultant damages. Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 884 (Pa. Super. Ct. 2000).  In this case, the sole dispute between the parties on this claim focuses on whether a contract existed that required ABM's employees to assist in the installation of holiday decor at the Philadelphia Premium Outlets, or whether such work fell outside the scope of the Service Agreement.

At first blush, the Court is not wholly convinced by the Chelsea Defendants' argument. A plain reading of the Service Agreement reveals it to be fairly specific as to the types of work required of ABM, all of which involves either janitorial services or snow removal.  Nothing in the Service Agreement indicates, as suggested by Christopher Speca, that ABM's "services

---

servant theory, without acknowledging that this doctrine would only apply to the negligence counts against it.  The Chelsea Defendants, for their part, do little to distinguish among the various causes of actions.  Accordingly, the Court engages in its best efforts to provide some semblance of order to the briefing before it.

encompass general upkeep and care for the center and other special projects." (Speca Dep. 35:16–21.)  Indeed, Mr. Speca conceded that he did not know exactly what was in the Service Agreement and was not aware of anything that specifically required ABM to assist with holiday light display.[5]  (Id. at 38:17–22.)

Nonetheless, several factors give the Court pause regarding the scope of the Service Agreement.  First, the Court can find—and the parties point to—no provision within the Service Agreement that states that the list of work described therein was the exclusive work for which ABM was responsible.  Indeed, the Agreement states that ABM "shall provide all management, supervision, and labor necessary to provide janitorial ***and related services*** as described herein." (Service Agreement, Part 2, § 1 (emphasis added).)

Second, "[i]t is the well-settled law of Pennsylvania that a written contract may be modified by a subsequent oral agreement. . . .  The modification may be accomplished by either words or conduct."  First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 280 (3d Cir. 1987).  "While one party to a contract cannot modify its terms without the assent of the other parties, the fact of agreement as to a modification may be implied from a course of conduct in accordance with its existence."  United States v. LeCroy, 348 F. Supp. 2d 375, 384 (E.D. Pa. 2004) (noting that a contract is validly modified if the party which did not propose the change is "shown to acquiesce in the modification through a course of conduct consistent with

---

[5]  The Court assigns no evidentiary value to Mr. Speca's affidavit, wherein he states that "[u]nder the Service agreement, ABM was responsible for performing tasks at the Outlets related to the general upkeep of the property."  (Speca Aff. ¶ 8.)  As noted above, Mr. Speca specifically testified that the did not know exactly what was in the Service Agreement.  See Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) ("A party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.").

13

acceptance") (quoting Int'l Bus. Lists, Inc. v. AT&T, 147 F.3d 636, 641 (7th Cir. 1991)).  To that

end, the record suggests that ABM, through a course of conduct, modified its Service Agreement

to include assistance with the installation of holiday decorations at the Philadelphia Premium

Outlets as part of its contractual duties.  Dennis Dotterer testified that one of the tasks that ABM

employees routinely did at the Philadelphia Premium Outlets was assist with various

maintenance tasks including the installation of holiday lights.  (Dotterer Dep. 27:21–28:19.)

Moreover, Brent Saville stated that the placement of outside holiday decorations was something

that ABM employees assisted with over several years.  (Saville Dep. 55:11–21.)  Most directly,

Christopher Speca remarked that "ABM has participated [in putting up holiday displays] over the

last few years [].  You know, they would be considered that other special projects where they

may have contributed to the overall assistance in the maintenance aspect of things."  (Speca Dep.

38:17–39:8.)  He did not view such projects as outside the scope of the Service Agreement.  (Id.

at 40:13–20.)  Rather, he noted that, "we've practiced over the years and still do, that they

participate, ABM participates in the overall maintenance of the center.  They get involved in a lot

of different things [other than just cleaning]."  (Id. at 41:14–22.)  Glaringly absent from the

record is (1) any testimony from any ABM official indicating that, over the course of these years,

ABM ever objected to the use of ABM employees in the holiday decoration at the Outlets; and

(2) any proof that ABM demanded additional payment, above the contract price, for the work.

This void in the evidence is suggestive of ABM's acquiescence to the holiday decorating work

being included within the scope of the Service Agreement.

Given this record, a genuine issue of material fact exists as to whether, through a course

of conduct, the Service Agreement was modified to include ABM's participation in the holiday

14

decoration at the Outlets.  Should the facts at trial conclusively establish such a contractual

obligation, then the Chelsea Defendants may present a plausible argument that the ABM

employees' improper installation of that decor—which ultimately resulted in Plaintiff's

fall—violated the provision of the Agreement requiring all personnel employed by ABM under

this Agreement to be "capable employees, training and qualified in custodial type work."

(Service Agreement, Part 2 § 5.)  Because a viable claim of breach of contract against ABM

exists, ABM is not entitled to a blanket grant of summary judgment.

   B.   **Whether the ABM Employees Were the Borrowed Servants of the Chelsea Defendants**

   Via their second argument, the Chelsea Defendants contend that even assuming

Defendant ABM could conclusively establish that installation of the holiday decor was not within

the scope of the Service Agreement, it has failed to prove that the employees were the "borrowed

servants" of the Chelsea Defendants for purposes of that task.  Absent such proof, the Chelsea

Defendants assert that they may prevail on their Pennsylvania Rule of Civil Procedure 1031.1

and negligence Cross-claims.  The Court agrees.

   Under Pennsylvania law, a prerequisite to the imposition of vicarious liability is the

establishment of a master-servant relationship.  Dickerson v. Am. Sugar Ref. Co., Inc., 211 F.2d

200, 202 (3d Cir. 1954).  "A master is one who stands to another in such a relation that he not

only controls the results of the work of the servant, but also may direct the manner in which such

work shall be done."  Mettee v. Tyson, No. Civ.A.90-5302, 1990 WL 182149, at *2 (E.D. Pa.

Nov. 26, 1990).  A master is vicariously liable for the tortious conduct of his servant only where

the servant acts within the scope of his employment and where the master has control over the

servant's physical conduct in the performance of the services.  Waggaman v. Gen. Fin. Co. of

Phila., 116 F.2d 254, 257–58 (3d Cir. 1941); see also Chuy v. Phila. Eagles Football Club, 595

F.2d 1265, 1276 (3d Cir. 1979)  A servant's conduct is within the scope of employment when

"(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized

time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master . . .

Conduct of a servant is not within the scope of employment if it is different in kind from that

authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to

serve the master."  Butler v. Flo-Ron Vending, 557 A.2d 730, 736 (Pa. Super. Ct. 1989) (quoting

Restatement (Second) of Agency § 228); see also Ceesay v. Miller, Mason & Dickenson, No.

Civ.A.90-2800, 1990 WL 121218, at *6 (E.D. Pa. Aug. 15, 1990).  As a general principle, the

determination of the nature of the employment relationship and the scope of employment fall

within the exclusive province of the factfinder.[6]  Chuy, 595 F.2d at 1276.

The borrowed servant doctrine, however, operates to alleviate the liability an employer

may face due to its employees' actions.  Under Pennsylvania law, "[t]he borrowed servant

doctrine is generally accepted as a means by which the acts of an employee who comes under the

control and supervision of a temporary employer are attributed to that employer."  Mastro v.

Maritrans Operating Partners, L.P., No. Civ.A.92-402, 1992 WL 396785, at *3 (E.D. Pa. Dec.

23, 1992).  In other words, "[o]ne who is in the general employ of another may, with respect to

certain work, be transferred to the service of a third person in such a way that he becomes, for the

---

[6] Notably, "if the facts alleged fail to support a reasonable inference that the servant was acting in furtherance of his employer's business, the servant's conduct falls outside of the scope of employment as a matter of law."  Ceesay, 1990 WL 121218, at *6 (citing Johnson v. Glenn Sand & Gravel Co., 453 A.2d 1048, 1050 (Pa. Super. Ct. 1982); Shuman Estate v. Weber, 419 A.2d 169, 173 (Pa. Super. Ct. 1980)).

first time being and in the particular service which he is engaged to perform, an employee of that

person." Walton v. Harold M. Kelly, Inc., 269 A.2d 347, 349–50 (Pa. Super. Ct. 1970)

(quotations omitted).  As defined by the Pennsylvania Supreme Court:

> The test for determining whether a servant furnished by one person to another
> becomes the employee of the person to whom he is loaned is whether he passes under
> the latter's right of control with regard not only to the work to be done but also to the
> manner of performing it. . . .   The entity possessing the right to control the manner
> of the performance of the servant's work is the employer, irrespective of whether the
> control is actually exercised. . . .   Other factors which may be relevant include the
> right to select and discharge the employee and the skill or expertise required for the
> performance of the work. . . .   The payment of wages may be considered, but is not
> a determinative factor. . . .   Although the examination of these factors guides the
> determination, each case must be decided on its own facts.

JFC Temps, Inc. v. Workmen's Comp. Appeal Bd., 680 A.2d 862, 864 (Pa. 1996).  As such, "the

third person, the alleged borrowing employer, must control not only the work the employee is to

do but also the manner of its performance." Fitzpatrick v. Consol. Rail Corp., No. Civ.A.90-

2938, 1992 WL 201105, at *2 (E.D. Pa. Aug. 11, 1992) (citing Hamler v. Waldron, 284 A.2d

725, 726 (Pa. 1970)).  Stated differently, "[t]he determination is based on the right to control the

employee, and not on the actual control exerted." Selective Way Ins. v. Travelers Prop. Cas. Co.

of Am., 724 F. Supp. 2d 520, 530 (E.D. Pa. 2010).  If it is established that the temporary

employer exercised "authoritative direction and control" over the temporary employee at the time

of the negligent act, "[a] finding of liability based on the borrowed servant doctrine ordinarily

will absolve the general employer of liability and shift total liability for the servant's negligent

acts to the borrowing employer." Mastro, 1992 WL 396785, at *5 (quoting Minnkota Power Co-

op, Inc. v. Manitowoc, 669 F.2d 525, 532 (8th Cir. 1982).

Notably, however, "[i]n situations where there is a continuation of general employment

17

such that the general or lending employer exercises some control over the temporary employee, or where the temporary employee is acting on behalf of the general employer, liability will not be imposed on the temporary employer for the employee's actions."  Id. at *3 (citing Minnkota, 669 F.2d at 532 ("A total shift in liability does not occur, however, when the servant simultaneously performs an act which falls within the scope of employment for both the general employer and the borrowing employer.")).  Where right of control must be inferred from the circumstances, courts should consider several factors to evaluate whether there is a continuation of general employment, including: "(1) whether the general employer can properly substitute another servant at any time; (2) whether the time of the new employment is short; (3) whether the lent servant has the skill of a specialist; and (4) whether the general employer continues to pay the borrowed servant's benefits."  Id. (citing Tyson v. Litwin Corp., 826 F.2d 1255, 1258–59 (3d Cir. 1987) (further citations omitted)).  In addition, the court can weigh in factors such as who maintained the right to hire and discharge, who had the right to select the employees used on the job, and who paid the employees.  McLelland v. United States, No. Civ.A.08-801, 2009 WL 4595954, at *2 (W.D. Pa. Dec. 3, 2009).  Ultimately, the presumption is that a transferred employee remains in the employ of his original employer, but that presumption is rebuttable by evidence that the borrowing employer assumed "control" over the employee.  Virtue v. Square D Co., 887 F. Supp. 98, 101 (M.D. Pa. 1995); see also Michalesko v. Office Max, No. Civ.A.04-2479, 2006 WL 1725553, at *6 (M.D. Pa. June 20, 2006) (recognizing the presumption of continued general employment).  "When the facts are undisputed, the determination of who is the employee's employer is one of law, but when the facts are disputed the question is one of fact." Fitzpatrick, 1992 WL 201105, at *3 (quotations omitted); see also Lane v. Schacht, 393 A.2d

18

1015, 1019 (Pa. Super. Ct. 1978) ("'[W]hen different inferences can reasonably be drawn from

the testimony as to whether the lender or the borrower is the controlling master at the time of the

accident, or whether both of them have the right to control, the question is one for the jury.'")

(quoting Slidekum v. Animal Rescue Lodge, 45 A.2d 59, 62 (Pa. 1946)).

In the present case, Defendant ABM argues that "assuming that ABM employees assisted

in installing holiday lighting and decoration, of which there is no evidence of record other than

the vague and conclusory statements of Mr. Saville,"[7] there is no evidence that ABM exercised

any control or supervision of any employee that installed the holiday lighting and/or decoration at

the Philadelphia Premium Outlets.  (Def. ABM's Mem. Supp. Mot. Summ. J. 8.)  Rather, they

assert that Brent Saville was the sole maintenance person employed to work at the Philadelphia

Premium Outlets and, per his testimony, unidentified employees of ABM "helped" him install

the outdoor holiday decorations.  Mr. Saville confirmed that (1) ABM did not provide any

supplies or equipment used to install the decorations; (2) ABM did not instruct or direct him how

to install or display the holiday decorations; (3) instructions, if any, on how to display or install

---

[7] Notwithstanding ABM's cursory challenge to the evidence regarding the participation
of ABM's employees, the Court finds that a genuine issue of material fact exists as to whether
ABM employees were actually involved in the installation of the holiday decorations.  While it is
undoubtedly troubling that no witness can identify the specific individuals from ABM who
participated in the holiday decorating at the Outlets, Brent Saville unequivocally stated that two
ABM employees were present and assisted him in wrapping garlands and lights on the lampposts
and specifically helped him install the electrical cord at issue.  (Saville Dep. 37:22–38:22.)
Moreover, Christopher Speca stated, based on his personal knowledge, that ABM employees
were involved in the installation of holiday lighting at the Philadelphia Premium Outlets in
November of 2007.  (Speca Dep. 38:17–39:13.)  Finally, Dennis Dotterer—an ABM
supervisor—admitted that during the 2007 holiday season, ABM employees assisted in putting
up holiday decorations under the direction of Victor Buono and Chris Speca.  (Dotterer Dep.
16:15–20, 46:4–19, 53:4–13.)  In response to such testimony, Defendant ABM offers no
evidence to clearly establish that no ABM employee was or could have been involved.
Accordingly, the Court cannot grant summary judgment based on this argument.

the decorations were provided by Ronald Scott, the Operations Manager at the Philadelphia

Premium Outlets; and (4) the location, manner, and placement of the lights and electrical cords

was a decision by the manager and/or owners of the Philadelphia Premium Outlets.  Mr. Saville

further noted that he never informed the ABM employees that they had a responsibility to tape

down the subject electrical cord or place a covering on top of the subject electrical cord.  As

such, Defendant ABM concludes that its employees "were acting outside the scope of their

employment as custodians at the mall and, any such work was done ***solely*** according to the

instruction and direction of the managers or owners of the mall."  (Def. ABM's Mem. Supp.

Mot. Summ. J. 8 (emphasis in original).)  Therefore, ABM asserts that it cannot be vicariously

liable for the alleged negligent acts of these employees.

Looking at the various circumstances to determine whether right of control can be

inferred, however, the Court must conclude that ABM has not offered sufficient evidence to

rebut the presumption that these employees remained in the general employ of ABM.  On the one

hand, ABM presented significant testimony from various witnesses that the Chelsea

Defendants—the alleged "borrowing" employee—controlled the nature and manner of the work

that the ABM employees were to do with respect to the installation of the holiday decorations

and supplied all of the decorations and equipment to the employees.  (Saville Dep. 38:23–39:14,

61:18–63:21, 68:20–69:18.)  On the other hand, "Pennsylvania courts have consistently held that

the mere fact that a special employer points out the work to be done and the place where it is to

be done, does not negate the original master-servant relationship."  Matonti v. Research-Cottrell,

Inc., 202 F. Supp. 527, 537 (E.D. Pa. 1962); see also Smart v. Ashland Chem., Inc., Div. of

Ashland Oil, Inc., No. Civ.A.91-0657, 1992 WL 10476, at *2 (E.D. Pa. Jan. 16, 1992) (citing

20

Mature v. Angelo, 97 A.2d 59 (Pa. 1953)).  Indeed, considering the factors set forth in the aforementioned cases, the Court finds a genuine issue of fact as to whether there was a "continuation of general employment such that the general or lending employer [ABM] exercises some control over the temporary employee, or where the temporary employee is acting on behalf of the general employer."  Mastro, 1992 WL 396785, at *3.  As set forth in Mr. Speca's affidavit, the Chelsea Defendants did not have any authority to hire, fire, or train ABM employees from their general employment, as these responsibilities fell on ABM itself.  (Speca Aff. ¶¶ 12–14.)  In addition, Mr. Speca remarked that, while at the Philadelphia Premium Outlets, ABM was responsible for having a "lead person" to supervise and direct ABM in their responsibilities.  (Id. ¶ 15.)  The ABM employees were paid only by ABM under their own payroll, never by Chelsea Defendants.[8]  Further, the record is clear that ABM continued to receive payment under the Service Agreement for the work provided by these employees—meaning that any work these employees did was for the benefit of ABM.  Finally, there is no evidence that the borrowed employees had any specialized skills, that they worked at the Outlets for any extended time, or that ABM could not, at its sole discretion, substitute other employees into their positions.  See Tyler v. Litwin Corp., 826 F.2d 1255, 1259 (3d Cir. 1987) ("A continuation of the general

---

[8]  In its Reply Brief, ABM asserts that Mr. Saville—"[t]he Chelsea Defendants' custodial supervisor"—controlled scheduling, payroll, administration, and oversaw the work of AMBm employees at the time of the Grand Opening.  (Def. ABM's Reply Br. 4.)  A closer reading of Mr. Saville's testimony, however, reveals that when initially giving this answer, he was discussing his duties when employed as a custodial supervisor *for ABM*.  (Saville Dep. 19:14–20:23.)  When counsel clarified that his questions were directed to Mr. Saville's duties as a custodial supervisor when employed by *the Chelsea Defendants*, Mr. Saville indicated that he simply did scheduling for ABM employees by making phone calls to an ABM account manager, who would then supply sufficient janitors, and would oversee them generally to make sure that everything was getting done properly.  (Id. at 20:24–22:15.)  He never suggested that, when employed by the Chelsea Defendants, he ever controlled ABM's payroll or administration.

employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.") (citing Restatement (Second) of Agency § 227 cmt. c (1958)).

Reviewing the evidence in the light most favorable to the non-moving party, different inferences can reasonably be drawn from the testimony as to who had the right to control the ABM employees at the time of the accident, and whether the employees performed an act which simultaneously fell within the scope of employment for both parties.  As such, Defendant ABM has failed to meet its burden of presenting an irrefutable evidentiary record that the Chelsea Defendants ever had the "right to control" the ABM employees or that there was a break in their general employment with ABM.  Given the disputed and/or missing facts, the applicability of the borrowed servant doctrine to this case falls within the province of the jury.  Lane, 39 A.2d at 1019.

## V.    CONCLUSION

In sum, the Court finds that while evidence exists that the ABM employees assisted in the installation of the holiday decor that allegedly caused Plaintiff's fall, a genuine issue of material fact remains on the questions of (a) whether the improper installation of that decor constituted a breach of ABM's duties under the Service Agreement, and (b) whether the ABM employees were the "borrowed servants" of the Chelsea Defendants, such that any negligence by the employees is imputed only to the Chelsea Defendants.  At trial, ABM shall have the opportunity to dispute the scope of the contract and to re-raise the borrowed servant defense.  On the present record, however, the Court simply cannot conclusively find that ABM has no liability for the Plaintiff's injuries.